**Below are the Findings of Fact and Conclusions of Law of the Court.**

Brian D. Lynch
**Brian D. Lynch**
**U.S. Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

---

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>VIRGINIA COVERDALE,<br><br>               Debtor. | Case No. 16-44453-BDL |
| JZK, INC.,<br><br>               Plaintiff,<br><br>    v.<br><br>VIRGINIA COVERDALE,<br><br>               Defendant. | Adversary No. 17-04014-BDL<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

      The trial was held in this adversary proceeding on October 25, 2017. Plaintiff JZK, Inc. ("JZK") appeared through counsel, Eric D. Gilman, and Defendant Virginia Coverdale ("Coverdale") appeared pro se. The issues presented at trial were (1) whether Coverdale committed a tort of abuse of process which willfully and maliciously injured JZK pursuant to 11 U.S.C. §523(a)(6) during the lawsuit that JZK filed against her, and (2) whether certain contempt sanctions were nondischargeable pursuant to 11 U.S.C. §523(a)(6 and 7).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

**Below are the Findings of Fact and Conclusions of Law of the Court.**

**Introduction**

JZK sued Coverdale in Thurston County Superior Court for violating the terms of a confidentiality provision in a contract, and Coverdale mounted an ultimately unsuccessful defense, raising counterclaims and affirmative defenses. JZK prevailed in its lawsuit against Coverdale and was awarded $600,021.00 in attorney's fees and costs pursuant to an attorney's fees provision in its contract. When Coverdale filed a voluntary Ch. 7 petition for bankruptcy relief, JZK's entire debt stood to be discharged pursuant to 11 U.S.C. §727.

In an effort to avoid the discharge of its attorney's fee award, JZK has attempted to recast Coverdale's conduct during its lawsuit as an "abuse of process," which could potentially form the basis of a "willful and malicious" injury pursuant to 11 U.S.C. §523(a)(6). The tort of "abuse of process" arises in litigation when a party misuses litigation primarily for the purpose of achieving another, inappropriate end. *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wash.2d 800, 699 P.2d 217 (1985). It requires a showing of extreme conduct; a form of extortion. *Batten v. Abrams,* 28 Wash. App. 737, 746, 626 P.2d 984 (1981). JZK has not demonstrated that Coverdale's conduct in the lawsuit it filed against her rises to the level of extreme conduct required to show an abuse of process. While ultimately unsuccessful, Coverdale's defenses and counterclaims were not devoid of merit, and no court found any of her arguments frivolous. The Court also finds that Coverdale did not have an improper motive in pursuing her defense, nor were her actions in defending the claim improper. Therefore, JZK failed to show that Coverdale caused a willful and malicious injury.

Furthermore, JZK has not demonstrated that 11 U.S.C. §523(a)(7) applies in this case because one of the contempt sanctions was reversed and remanded, and the second contempt sanction was both payable to JZK and compensatory in nature. Section 523(a)(7) only discharges a debt to the extent that "such debt is for a fine, penalty or forfeiture payable **to and for the benefit** of a governmental unit, **and is not compensation for actual pecuniary loss**.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2

**Below are the Findings of Fact and Conclusions of Law of the Court.**

. . ." (emphasis added). Therefore, the Court holds that Coverdale's entire debt to JZK is dischargeable.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (I). Having heard the testimony of the witnesses, reviewed the evidence submitted and heard the argument of counsel, the Court makes the following Findings of Fact and Conclusions of Law under Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.

**Findings of Fact**

1.      JZK is an entity formed by Judith Darlene Knight, a/k/a J.Z. Knight ("J.Z. Knight").

2.      J.Z. Knight asserts that she "channels" Ramtha, an alleged 35,000-year-old warrior spirit.

3.      J.Z. Knight and JZK operate Ramtha's School of Enlightenment ("RSE"), which was founded over 20 years ago. Through RSE, J.Z. Knight teaches spiritual principles allegedly provided to her by Ramtha. RSE is based in Yelm, Washington in Thurston County. Since its founding, the RSE claims to have had approximately 90,000 students.

4.      J.Z. Knight purports to own certain copyright protections relating to the teachings and teaching methods of RSE, which she licenses to JZK. JZK provides instructions in the teachings of Ramtha for profit.

5.      Defendant Virginia Coverdale began attending classes at RSE in 2006. Coverdale's mother and brother, David Champagne, were already students of RSE.

6.      As part of attending RSE, Coverdale was required to sign a document titled the "Conditions of Participation" ("CoP"). Coverdale signed two such documents, the latest of which was dated November 6, 2007. Ex. D4. The CoP contained a non-disclosure clause:

> The information and techniques taught here are for your knowledge only. You are licensed to use this information and techniques for your personal use only. By signing these Conditions of Participation, you agree not to teach or otherwise disseminate through speeches, books, articles, media interviews, or other forms of mass or group distribution (collectively, to "Teach or Disseminate") any information or techniques that you learn or are

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

**Below are the Findings of Fact and Conclusions of Law of the Court.**

taught at the School; and for teachers, that you teach at the School, nor will you assist or facilitate other persons in doing so without the prior written consent of the School. You further agree not to Teach or Disseminate anything you BELIEVE you received from Ramtha in a dream a vision or discipline, or any other source.

7. In 2007 or 2008, Coverdale had an affair with J.Z. Knight's then boyfriend, James Flick. J.Z. Knight became aware of the liaison and became upset with Coverdale.

8. RSE expelled Coverdale from the school in an email from J.Z. Knight. As a result, Coverdale became estranged from the RSE community and did not participate as a student for some time.

9. Later, Coverdale returned to RSE and attended several events. In February 2012, at an event at RSE where J.Z. Knight was allegedly channeling Ramtha in front of a gathering of RSE students, J.Z. Knight made statements that Coverdale and others interpreted as referring to Coverdale as a "whore." Ex. P2, p. 3. While Coverdale did not attend this event, she received calls from other members of RSE informing her of J.Z. Knight's statements.

10. After this event, Coverdale became disillusioned with RSE and began criticizing RSE and J.Z. Knight to local officials. Coverdale claimed that J.Z. Knight, JZK and RSE engaged in a number of practices that were injurious to RSE's students: alleged fire code violations at RSE's compound in Yelm, financial scams, instructing students to take the pharmaceutical Prozac and encouraging them to ingest a concoction that involved sea water and Red Devil lye. Coverdale believes that RSE is a religious cult and has concerns that RSE's followers could be harmed by J.Z. Knight, JZK, and RSE. Michael Wright, the JZK legal affairs liaison, admitted in testimony that there had been a fire in the JZK assembly hall when an amplifier caught fire, and that the JZK fire suppression system did not use smoke detectors. He also admitted that JZK had been involved in a Limited Offering for investment in an effort to develop international RSE schools.

11. When local officials failed to take any affirmative actions against RSE after Coverdale made several complaints, Coverdale believed that her concerns were being ignored

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

**Below are the Findings of Fact and Conclusions of Law of the Court.**

because RSE had made donations to the campaigns of various public officials in Thurston County.

12.     As a result, Coverdale sought to expose some of J.Z. Knight's potentially harmful teachings in the hope that public officials would distance themselves from RSE and reconsider Coverdale's complaints.  In October 2012, Coverdale received video footage from a third-party showing J.Z. Knight allegedly channeling Ramtha.  Coverdale edited the video footage down to a short clip and posted the video on YouTube on October 18, 2012.  The video posted by Coverdale showed J.Z. Knight disparaging various groups, including Mexicans, Jews, Catholics and homosexuals, among others.

13.     JZK became aware of the video Coverdale had posted online and on October 28, 2012, sent Coverdale a "cease and desist" letter demanding that Coverdale take the video down from YouTube.  Ex. P12.

**JZK Initiates Litigation against Coverdale**

14.     When Coverdale did not voluntarily remove the video, JZK filed a lawsuit on October 29, 2012 against her and "John Does and Jane Does 1-20" (the "Doe Defendants") in the Superior Court of the State of Washington for Thurston County.  Ex. P14.  The Complaint alleged claims for breach of contract and an injunction under the terms of the confidentiality clause contained in the CoP.  The Doe Defendants were alleged to be members of a group to which Coverdale belonged referred to as Enlighten Me Free ("EMF), consisting of former students of RSE.  The group maintained an online messaging board where ex-RSE students could discuss their concerns with JZK, J.Z. Knight and RSE.  As discussed below, in the course of the state court litigation, JZK attempted to serve discovery upon some of the group, and Michael Wright, the legal liaison officer for JZK, contacted members of the group.  He also sent a general email to former students, including members of EMF announcing the litigation with Coverdale.  Wright was disingenuous about the reason for these efforts, which the Court finds

**Below are the Findings of Fact and Conclusions of Law of the Court.**

were attempts to intimidate and suppress individuals who might oppose J.Z. Knight and JZK. In the JZK Lawsuit, JZK sought reimbursement for expenses of $42,319 for a private investigator, Linda Montgomery.  Ex. P77, p. 52:17-18.

### JZK Moves for a Temporary Restraining Order ("TRO")

15.     The day after filing the JZK Lawsuit, JZK filed a Motion for a TRO seeking to require Coverdale to take down the video she posted and to prevent her from posting additional footage.

16.     Coverdale opposed the TRO on the grounds that she did not breach the CoP and that the CoP was (1) unconscionable, (2) adhesive, (3) contrary to public policy, and (4) a Strategic Lawsuit Against Public Participation suit ("S.L.A.P.P.").  Ex. P1.  Coverdale's argument that she did not breach the CoP was based, *inter alia,* upon the fact that she was not attending RSE at the time she received the videos from a third-party who had received the video from a livestreamed online broadcast, and the CoP only banned dissemination of "information or techniques that you learn or are taught <u>at the School</u>." (emphasis supplied) Ex. D4.  The Court finds that her belief and arguments were in good faith, and while unsuccessful, not an unreasonable position.

17.     On November 1, 2012, the Superior Court granted JZK's TRO, which prohibited the dissemination of JZK's information or materials, including video footage. Ex. P16.  The Superior Court set a preliminary injunction hearing for November 14, 2012.

### JZK Takes Action to Discredit Coverdale

18.     In late October 2012, JZK also began to orchestrate a media effort to disparage Coverdale, and enlisted her brother, David Champagne, to send a letter to a reporter who was thought to be sympathetic with J.Z. Knight and JZK, disparaging Coverdale.  To encourage Champagne to write the letter, JZK put pressure on him and induced him to make a statement by offering him three tickets to a Ramtha "feast" for his mother, his wife and him.  A "feast" is a

special event where Ramtha purportedly channels through J.Z. Knight for an elaborate dinner with a small number of invitees. The charge for attending a "feast" with Ramtha is normally $5,000 per person, but the invitation to Champagne and his guests was free of charge. So Champagne obtained a benefit of $15,000 at the same time that they were attempting to get him to write a letter to a local paper disparaging his sister. Ex. D3, p. 2.

19.     JZK's legal liaison officer, Michael Wright, offered the explanation at trial in this case that JZK was only helping Champagne tell his story, but the Court finds this explanation not credible. JZK attempted to help Champagne with the language of the letter. Champagne was reluctant to make some of the statements, and an email exchange between JZK legal officer, Michael Wright, and JZK's public relations representative, Robert Wynne, demonstrates JZK's efforts to enlist Champagne in their plan for disparaging Coverdale. Ex. D3. Mr. Wright wrote in an email dated November 11, 2012 that:

> yesterday, he expressed a lot of misgivings about speaking things that he did not have personal knowledge about or interest in. His main concern was that most of the words were not his and he did not want to appear to have become a mouthpiece for the school. *Id.* p. 2.

20.     Then, after Champagne agreed to the final form, Mr. Wright wrote "he was dangling by thread (sic) yesterday morning when we spoke. He will bounce back though and I trust the timing will be perfect." *Id.*

**JZK Obtains a Preliminary Injunction against Coverdale**

21.     On November 14, 2012, the Superior Court granted JZK's preliminary injunction over Coverdale's objection. Ex. P34. The preliminary injunction order barred Coverdale from assisting in or facilitating the copying, reproducing or otherwise disseminating RSE information or materials, including, without limitation, audio footage or video recordings of any events at RSE. *Id.* at p. 3.

22.     On November 16, 2012, Coverdale filed an Amended Answer through her counsel, in which Coverdale admitted that she signed the CoP but denied the allegations that

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7

**Below are the Findings of Fact and Conclusions of Law of the Court.**

she breached the terms of that agreement.  Ex. P26.  Coverdale  asserted several affirmative defenses: (1) lack of capacity to sue, because the trademark and copyrights for the "information" which Coverdale was alleged to have improperly revealed were owned by J.Z. Knight, (2) failure to join a necessary party, (i.e., J.Z. Knight), (3) alter ego (Coverdale sought to pierce the corporate veil to name J.Z. Knight), (4) preemption under federal law, because Coverdale thought JZK's claims sounded in copyright and trademark law, (5) failure to state a claim, (6) unconscionability, (7) violation of public policy, (8) that the terms of the CoP were indefinite (9) misrepresentation and fraud, (10) fraudulent inducement, and (11) violation of the First Amendment to the U.S. Constitution and article I, section 5 of the Washington Constitution. *Id.*

23. Coverdale alleged counterclaims under the following theories: (1) a violation of Washington's SLAPP laws (RCW 4.24.500 et seq.) because the lawsuit was filed at or near the time Coverdale testified before the Thurston County Commissioners about fire, health and safety violations at RSE; (2) defamation per se arising out of J.Z. Knight's statements that Coverdale was a "whore"; and (3) misrepresentation and fraud based upon JZK's advertisements that J.Z. Knight allegedly represented that she "channeled" Ramtha and Jesus. *Id.*

24. Coverdale moved to join J.Z. Knight for her counterclaims based upon her alleged ownership of RSE's copyrights and trademarks, but that motion was denied on November 30, 2012.  Ex. P33.  Mr. Wright explained at the trial in this case that J.Z. Knight was the owner of the intellectual property and that she licensed it to JZK.

**JZK Moves to Dismiss Some of Coverdale's Counterclaims**

25. JZK filed a motion to dismiss Coverdale's counterclaims for misrepresentation and fraud on February 1, 2013.  Ex. P37.   These claims alleged by Coverdale were based upon the assertion that Coverdale entered into RSE and signed the CoP based upon the representations that J.Z. Knight channeled Ramtha *and* Jesus, which Coverdale asserted were

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

Case 17-04014-BDL   Doc 46   Filed 12/15/17   Ent. 12/15/17 12:10:43   Pg. 8 of 31

fraudulent.  Ex. P26.  In particular, Coverdale contended that subsequent to Coverdale joining RSE, J.Z. Knight admitted in another lawsuit that she had not channeled Jesus.  Ex. P38.  JZK argued in its motion to dismiss the counterclaims that the court could not interfere in the validity of J.Z. Knight's religious beliefs.  Ex. P37.  Coverdale argued in response that RSE did not hold itself out as a religion, and that the claim of fraud was based upon J.Z. Knight's admission that she never channeled Jesus, which was contrary to one of RSE's promotional materials.  Ex. P38.  The Court ruled in JZK's favor and granted dismissal of the counterclaims on February 8, 2013.  Ex. P40.  However, Coverdale still had counterclaims for violation of S.L.A.P.P. and defamation.

26.    Coverdale sought discretionary review of the Court's denial of Coverdale's motion to join J.Z. Knight and the preliminary injunction, but the State of Washington Supreme Court found that Coverdale failed to demonstrate that discretionary review was warranted.  Ex. P45.

27.    Shortly after JZK's motion to dismiss the counterclaims was granted on February 22, 2013, JZK's counsel, Eric Gilman, emailed Coverdale a settlement offer that Coverdale (1) enter into a permanent injunction prohibiting the copying, reproduction, preparation of adaptations, public distribution, public display, or other form of dissemination of RSE information, video or other materials covered by the CoP, (2) return all RSE information and videos and (3) agree to pay JZK $200,000.  Ex. P43.

28.    As her first attorney, Shawn Newman, was withdrawing his representation at that time, Coverdale emailed Mr. Gilman personally in response, stating that she had consulted a bankruptcy attorney before any action was taken against her; and that she:

> did not break the CoP.  JZ will end up paying her increasing legal fees no matter what.  I still have a counterclaims [sic] and from what I understand there are many stories yet to break in the press.  I think your client still has dreams of victories long ago when her clients included other charlatans and an uneducated community.  I truly have nothing to lose but time and frankly I feel this is now my calling. I guess I am just too dumb to be scared. See you in court.  Ex. P44.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9

**Below are the Findings of Fact and Conclusions of Law of the Court.**

29.     JZK paints this as evidence of an ulterior motive.  The Court finds that it is the not atypical bravado of an unsophisticated party when confronted with a foe making a settlement proposal which a party (in this case, Coverdale) felt was out of her reach and which fostered her sense of more heavy-handed behavior from JZK.  It is not persuasive evidence of an improper ulterior motive.

30.     Coverdale did not retain another attorney until April 2013, when attorney Breckan Scott agreed to represent her.  Shortly after being retained, Ms. Scott moved to amend Coverdale's answer and counterclaims.  The Court denied Coverdale's request to amend her Answer, though the case had only been filed six months previously and Coverdale had a new attorney.  Ex. P51.  The parties engaged in further discovery and there were several discovery disputes typical of contested litigation, such as the scope of the requests and the nature of J.Z. Knight's videotaped deposition.  JZK and J.Z. Knight opposed the publication of any part of J.Z. Knight's videotaped deposition and obtained an order prohibiting Coverdale from disseminating the video footage of J.Z. Knight's deposition.   JZK had sought to prevent a videotaped deposition of J.Z. Knight altogether.

31.     JZK also engaged in extensive motion practice against other third parties, including Glen Morgan, the Freedom Foundation, Enlightened Europa, Elizabeth Rule and David McCarthy.  Ex. P1 (the "Summary of Motion Practice").

**JZK Obtains Summary Judgment against Coverdale**

32.     In the summer of 2013, the parties submitted to the state court cross-motions for summary judgment (which were not made a part of this record).  Coverdale filed a Motion to Strike JZK's reply in support of its motion for summary judgment, alleging that it was filed late and that it sandbagged Coverdale by adding new factual assertions.  Ex. P69.  The Court granted Coverdale's motion.  Ex. P1.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10

**Below are the Findings of Fact and Conclusions of Law of the Court.**

33.     Prior to a determination on its motion for summary judgment, JZK voluntarily dismissed its claim for damages for breach of contract.  Ex. P62.  This was contested by Coverdale through her attorney, who sought a dismissal with prejudice. The Court ultimately granted JZK's motion to dismiss the breach of contract damages without prejudice.  Ex. P60.

34.     On June 28, 2013, the Court orally granted summary judgment for JZK and denied Coverdale's motion for summary judgment.  Ex. P71.  The written order granted JZK's motion for partial summary judgment and dismissed Coverdale's affirmative defenses and all of her remaining counterclaims.  Ex. P82.  However, instead of dismissing Coverdale's remaining counterclaims and affirmative defenses with prejudice, the judge dismissed them "as to this case," and implied that she could file the claims in a separate action (discussed below).  Ex. P82.  In its oral ruling, the Court also explained that "I do not believe that the defamation is a proper counterclaim to the issue before this Court today.  I think I've even mentioned before that some things might be appropriate in another context, but not here."  Ex. 115.

35.     Shortly thereafter, JZK filed a motion for attorney's fees and costs, seeking fees and costs for two law firms, Gordon Thomas Honeywell LLP ("Gordon Thomas") and Skellenger Bender PS, totaling $723,536.30 in attorney's fees and costs, and the aforementioned investigator's costs.  Ex. P77.  The Court reduced the attorney's fees and expenses award down to $600,021.00, broken down by $515,000 in attorney's fees and $85,021.00 in expenses. *Id.*

36.     Coverdale appealed the Court's summary judgment order directly to the Supreme Court of the State of Washington.  The Supreme Court declined discretionary review and transferred the appeal to the Washington Court of Appeals.  Ex. P102.

**JZK Seeks Contempt Sanctions against Coverdale in Supplemental Proceedings**

37.     Following the entry of its judgment for attorney's fees, JZK initiated supplemental proceedings to attempt to collect from Coverdale.  JZK first requested a writ of execution against

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Coverdale's automobile.  Ex. P127, p. 6.  On September 13, 2013, the Court issued a writ directing the sheriff to deliver possession of Coverdale's vehicle to JZK.  Ex. P110, p. 39.

38.     Coverdale moved to quash the writ, claiming that the value of the car did not exceed the $3,250 personal property exemption under RCW 6.15.010(1)(c)(iii).  *Id.* The Court denied Coverdale's motion to quash, and instead ordered the parties to follow a procedure where they were each to obtain an appraisal of the car, and if they did not agree, the appraisers were to appoint a third-party to appraise the car (the "October 23, 2013 Order").  *Id.* at p. 40.

39.     The initial appraisals came back far apart.  Before a third-party appraiser could be appointed, Coverdale sold her car for $3,500 to a friend, Kevin O'Sullivan, and used the proceeds for basic household needs.  *Id.*; P105, p.55.  Coverdale stated in her Amended Brief of Appellant that she had obtained an appraisal from Bruce Titus Nissan, but that Bruce Titus Nissan "refused to participate in selecting a tie-breaker appraiser." Ex. P105.  JZK provided this Court with a Declaration of Virginia Coverdale in the JZK lawsuit, in which Coverdale stated that the 2004 Nissan Xterra had a trade in value of $2,652.00.  Ex. P85 (without the exhibits containing the appraisal).  JZK did not offer its appraisal into evidence in the trial in this case.  The Transcript of the November 22, 2013 hearing indicated that JZK asserted that the value was "over $7,000." Ex. P91, p. 7:2.  Similarly, JZK did not introduce the September 13, 2013 order regarding the writ of execution or the October 23, 2013 Order into evidence in this case.

40.     JZK sought an order of contempt before the Court as to Coverdale and her counsel seeking a finding that she was in contempt of both the September 13 and October 23, 2013 Orders.  After holding a hearing, the Court entered an order on December 20, 2013, finding Coverdale in contempt for selling her 2004 Nissan Xterra, in violation of two orders, and ordering her to pay a $3,000 penalty to the court.  Ex. P92.  The Court also gave Coverdale three weeks to purge the contempt by repurchasing the vehicle from Mr. O'Sullivan.  *Id.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12

**Below are the Findings of Fact and Conclusions of Law of the Court.**

**Coverdale's Lawsuit against J.Z. Knight and JZK**

41.     Because Coverdale's counterclaims in the JZK Lawsuit had been dismissed without prejudice in July 2013, and those rulings were being appealed to the appellate court, Coverdale filed her own lawsuit in Thurston County Superior Court against J.Z. Knight, JZK and John and Jane Does 1-100, case no. 14-2-00328-2, on February 18, 2014.  Ex. P94 (the "Coverdale Lawsuit").  The Coverdale Lawsuit alleged claims of defamation, defamation per se, false light, outrage, intentional infliction of emotional distress, consumer protection act claims, misrepresentation and fraud, negligence and conspiracy.  *Id.*

42.     JZK filed a motion to strike Coverdale's claims of defamation, defamation per se, false light and outrage under Washington's anti-SLAPP law, RCW 4.24.525.  Ex. P115.  JZK also moved to dismiss Coverdale's complaint in its entirety under CR 12(b), under the statute of limitations, res judicata, collateral estoppel and lack of merit.  *Id.*

43.     In a letter ruling dated December 12, 2014, the Court in the Coverdale Lawsuit (a different judge than the one in the JZK Lawsuit) granted in part and denied in part both of JZK's motions to strike and dismiss.  *Id.*  The Court struck only the outrage claim and the intentional infliction of emotional distress claims.

44.     The Court declined to strike Coverdale's other claims, and allowed them to proceed.  Regarding Coverdale's defamation claim, the Court held that she "has demonstrated a substantial likelihood that she could prevail." *Id.* at p. 5.

45.      The  Court declined to dismiss Coverdale's claims under the statute of limitations, finding that Coverdale's claims were timely filed.  *Id.* at p. 7.  The Court noted that JZK did not even respond to Coverdale's argument.  *Id.*  The Court also declined to apply the doctrine of res judicata and collateral estoppel, noting that the prior adjudication had not ended in a final judgment on the merits. *Id.*  The order granting JZK summary judgment in the JKZ Lawsuit had the words "dismissed with prejudice" crossed out and replaced with the words "dismissed as to

this case." *Id.* The Court noted that the transcript from the summary judgment ruling in the JZK Lawsuit stated, "When I am dismissing [the counterclaim] I'm dismissing it in this case. I'm not telling you what you can do or not do in the future." *Id.*

46.     In regard to the defamation claim, which was based upon statements made at a RSE gathering that Coverdale was a "whore" and also based upon the letter written by Coverdale's brother, David Champagne, stating she was "unwell," the Court declined to dismiss Coverdale's claims. The Court also declined to dismiss Coverdale's civil conspiracy claims.

47.     In sum, the Court finds that the positions taken by Coverdale were not unreasonable, nor were her actions improper throughout the JZK and Coverdale lawsuits.

**The October 31, 2014 Contempt Finding against Coverdale**

48.     On October 31, 2014, while the appeal was pending in the JZK Lawsuit, the Court in the JZK Lawsuit granted a motion by JZK that Coverdale was in contempt of court "based on her intentional continued public dissemination of JZK, Inc. materials in violation of the permanent injunction." Ex. P107. The motion had to do with a Facebook post by Coverdale, which contained a link to a website that featured video clips different from the YouTube video which Coverdale had originally posted. The Order noted that its findings were for the reasons stated in the Court's oral ruling on May 30, 2014. *Id.* JZK offered excerpts from a transcript of the May 30, 2014 hearing into evidence to this Court as Ex. P100, but not the entire transcript. The Court found that Coverdale was in contempt without determining whether Coverdale intended to violate the permanent injunction that was in place or whether she was aware that she was violating the permanent injunction. Instead, he focused on whether she intended to make a post on her Facebook page:

> In this particular case, it is absolutely clear to me that the postings on Facebook by Ms. Coverdale are in violation of the Court's specific order at the time that the summary judgment motion was granted. Whether or not Ms. Coverdale understood is not the issue as far as I'm concerned. I know that a contempt motion must show that it was intentional. What's intentional, what's required to be

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14

**Below are the Findings of Fact and Conclusions of Law of the Court.**

intention is the doing of the act that is the violation, and that's clear to me. I am finding that there is a basis for contempt. . . .

Ex. P100, pp. 13:21 – 14:6. None of the pleadings that gave rise to the contempt order, including the alleged Facebook post, were entered into evidence in this case.

49.     On November 21, 2014, the Court granted the Motion for Contempt and Coverdale was ordered to pay to JZK $9,017.87, representing JZK's fees and costs for the motion, within 30 days of the entry of the order. Ex.'s P107 and P111. This amount remains unpaid.

**The Washington Court of Appeals Ruling on the Appeal of Coverdale**

50.     On January 19, 2016, the Court of Appeals issued an unpublished opinion in the JZK Lawsuit. Ex. P127. The Court of Appeals affirmed all the Superior Court's rulings except for the order finding Coverdale in contempt for selling her car, which it reversed and remanded. *Id.* at p. 1.

51.     The Court of Appeals held that the Court erred in holding Coverdale in contempt for a violation of the writ of execution, and found that Coverdale did not intend to violate the writ of execution. *Id.* at pp. 28-29. The Court of Appeals affirmed the finding that Coverdale was in contempt for a violation of the appraisal order. *Id.* at pp. 28, 30, 31. However, the Court of Appeals reversed and remanded the contempt sanction to the Superior Court to reconsider the amount of the sanction because the award of $3,000 was based upon a violation of both orders.

52.     Finally, the Court of Appeals rejected JZK's request to find that the appeal was frivolous, noting that "Coverdale's appeal is not so devoid of merit as to be frivolous." *Id.* at p. 34. In rejecting JZK's claim that Coverdale's arguments were frivolous, it chastised JZK for filing a 50 page brief with many large footnotes that contained core facts and substantive arguments. *Id.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 15

**Below are the Findings of Fact and Conclusions of Law of the Court.**

### The Dismissal of the Coverdale Lawsuit

53.     Seven days after the Court of Appeals issued the January 22, 2016 unpublished opinion in the JZK Lawsuit, Coverdale and JZK executed an Agreed Order of Dimissal of the claims in the Coverdale Lawsuit with prejudice.  Ex. P129.   The parties also agreed that "there shall be no costs or fees awarded under the above referenced case number to any party." *Id.*, no. 2.

### The Supreme Court of Washington Denied Review of Coverdale's Appeal

54.     Coverdale appealed the Court of Appeals' January 22, 2016 opinion in the JZK Lawsuit to the Supreme Court of Washington.  On August 31, 2016, the Supreme Court of Washington ruled that it declined to review the matter, and awarded JZK its costs associated with the appeal under RAP 18.1(j).  Ex. P132.  The Supreme Court did not make any findings that any of Coverdale's claims were frivolous.

55.     The following month, on September 9, 2016, Coverdale stipulated to an amount of $11,658.24 of JZK's attorney's fees with respect to the appeal to the Supreme Court of Washington.  Ex. P140.

### Coverdale Was Not Overly Litigious in the JZK Lawsuit

56.     JZK is zealous in litigating disputes with its students about information it asserts is confidential and proprietary, and has filed lawsuits not only in this country, but also in other countries as well.  JZK employed two law firms in the state court litigation with Coverdale and engaged in extensive motion practice, filing a majority of the motions and discovery listed in the Summary of Motion Practice in Ex. P1.

57.     The Court has reviewed the 140 exhibits JZK has offered into evidence before this Court, and only six documents were motions or discovery initiated by Coverdale in the JZK lawsuit.  JZK's Summary of the JZK Lawsuit Pleadings, Ex. P1, which describes other pleadings from the JZK Lawsuit not offered into evidence here, shows fewer than ten motions filed by

**Below are the Findings of Fact and Conclusions of Law of the Court.**

Coverdale in the JZK Lawsuit. One of the filings initiated by Coverdale, a "Motion to Strike Plaintiff's 1st Summary Judgment Reply Materials" which challenged JZK's untimely and oversized reply brief, was granted on June 14, 2013 in Coverdale's favor due to JZK's failure to follow rules and procedures. Ex. P1, p. 6. In addition, in that same summary, five of the pleadings involved JZK obtaining compliance from third parties and did not even directly involve Coverdale. Ex. P1, pp. 2-5.

### Coverdale's Comments on Social Media

58.     Throughout the litigation, Coverdale made comments on social media to her friends about the JZK Lawsuit. She made comments that she had consulted with a bankruptcy attorney, and that JZK's damages would be discharged ((Ex's P44, P79, P104 and P131). The Court finds that these were mostly harmless posts intended to be informative and humorous to Coverdale's friends and supporters, or to emphasize that she was "judgment-proof." For example, in response to a comment on Facebook inquiring "Does this mean the drunkard is coming for your kid's pets and the toilet paper?" Coverdale responded "LOLOLOLOL, I hope so…costs her more money every time and still…she gets, NADA." Ex. P104.

59.     Coverdale also made several statements concerning the mounting legal fees that JZK was incurring as a result of its litigation with her (Ex.'s P131, P79, P90, P89 and P93, P104). In another post where Coverdale was reporting to her followers after the Superior Court awarded JZK its attorney's fees and costs, she wrote:

> he reduced the legal fees by about 100,000. Whew. I was so worried about that extra 100,000. Then Jeff Grant whined about me not having anything to lose so therefore as we keep going we are ringing up bills I can't pay. Breckan and I wept for him and his client realizing how unfair it is THEY sued a women [sic] with no money and what a bad position that has put them in. Ex. P79.

Three of these exhibits, P89, P90 and P93, concern the costs that Coverdale perceived JZK was spending to obtain possession of her 9-year-old Nissan Xterra, which she argued had little or no nonexempt equity. In hindsight, it was imprudent to post all one's thoughts in public,

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17

1  particularly when litigating with the likes of JZK, but the Court finds that the posts reflect the

2  unsophisticated Coverdale's surprise at JZK's litigation approach as she and her attorneys

3  defended against their aggressive tactics, given her lack of resources, rather than some

4  purposeful plan whose primary goal was to force J.Z. Knight and JZK to incur those fees.

5  **Coverdale Files a Bankruptcy Petition under Ch. 7 of the Bankruptcy Code**

6  60.    On October 27, 2016, Coverdale filed a voluntary Ch. 7 bankruptcy petition.  In

7  her Ch. 7 case, Coverdale moved to avoid JZK's $600,021 judicial lien against Coverdale's

8  residence, which motion was granted on February 3, 2017.  On the same date, JZK filed this

9  adversary complaint objecting to the discharge of a debt against Coverdale under 11 U.S.C. §§

10  523(a)(6 & 7).  Ex. D19.

11  61.    On November 3, 2016, at a time when the automatic stay was in effect, the Court

12  of Appeals of the State of Washington issued a "Ruling Awarding Attorney's Fees and Costs"

13  in the amount of $82,928 in attorney's fees and $697.07 in costs.  Ex. P135.

14  62.    JZK seeks to have all of its attorney's fees and costs arising out of the JZK Lawsuit

15  and   damages   for   the   contempt   sanctions   awarded   against   Coverdale   declared

16  nondischargeable.  Ex. D19, p. 22.

17  **Conclusions of Law**

18  **JZK's Abuse of Process Claims under 11 U.S.C. §523(a)(6)**

19  JZK claims that Coverdale willfully and maliciously committed an abuse of process to

20  cause JZK to incur legal fees.  Pl.'s Trial Brief, ECF No. 39, p. 4.  Section 523(a)(6) of the

21  Bankruptcy Code provides "(a) A discharge under section 727. . . of this title does not discharge

22  an individual debtor from any debt . . . (6) for willful and malicious injury by the debtor to another

23  entity. . . ."  In *Petralia v. Jercich* (*In re Jercich*), 238 F.3d 1202, 1205 (9th Cir. 2001), the Ninth

24  Circuit instructed courts to conduct a two-part inquiry in a Section 523(a)(6) case: (1) whether

25  the debtor's conduct was "tortious," and then (2) whether the debtor's conduct was both "willful"

**Below are the Findings of Fact and Conclusions of Law of the Court.**

and "malicious." *Id.* at 1206–09. JZK has the burden of proving by a preponderance of the evidence that Coverdale's actions were tortious, willful and malicious. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Although federal law governs a debt's dischargeability, courts look to state law to determine whether an underlying tort has occurred. *Jercich*, 238 F.3d at 1206.

### JZK Has Not Shown that Coverdale Committed an Abuse of Process

In *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wash.2d 800, 699 P.2d 217 (1985), the Supreme Court of Washington stated that for "the tort of abuse of process, the crucial inquiry is whether the judicial system's process, made available to insure the presence of the defendant or his property in court, has been misused to achieve another, inappropriate end." 103 Wash. 2d at 806. Washington courts have adopted a three-part test to establish abuse of process: "a claimant must prove (1) an ulterior purpose to accomplish an object not within the proper scope of the process, (2) an act not proper in the regular prosecution of proceedings, and (3) harm proximately caused by the abuse of process." *Bellevue Farm Owners Ass'n v. Stevens*, 198 Wash. App. 464, 477, 394 P.3d 1018, 1024 (2017). In the *Sea-Pac Co.* decision, the Washington State Supreme Court adopted the Restatement of Torts Section 682. The comments to Restatement (Second) on Torts Section 682 provide further guidance regarding the provision in that section that for abuse of process, the alleged tortfeasor must have used process "primarily" for a purpose for which it was not intended:

> *b. "Primarily."* The significance of this word is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. Thus the entirely justified prosecution of another on a criminal charge, does not become abuse of process merely because the instigator dislikes the accused and enjoys doing him harm; nor does the instigation of justified bankruptcy proceedings become abuse of process merely because the instigator hopes to derive benefit from the closing down of the business of a competitor. For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended. *The usual case of abuse of process is one of some form of extortion, using the process to*

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19

*put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it. (*emphasis added*).*

Restatement (Second) of Torts § 682 (1977), cmt. b. The Court concludes that Coverdale's conduct in the JZK Lawsuit does not constitute an "abuse of process" under Washington law.

### a. JZK Failed to Prove that the Coverdale Legal Defense Was Primarily for an Improper Ulterior Purpose

First, the Court concludes that Coverdale did not have an ulterior purpose to accomplish an object not within the proper scope of the process. Coverdale did not initiate the JZK lawsuit, but merely was attempting to defend herself from the damages sought by JZK. The Court concludes that Coverdale's primary objective for participating in the litigation with JZK was to prevail in the litigation and to minimize, if not eliminate, her liability to JZK. While many of her defenses and counterclaims were ultimately rejected by the trial court and the Court of Appeals, no court held that any of Coverdale's defenses were frivolous. She was well within her rights to attempt to challenge the applicability and enforceability of the CoP against her, and those arguments were made in good faith.

The several statements made by Coverdale to JZK's counsel or social media that her debts would be dischargeable in bankruptcy (Ex's P44, P79, P104 and P131) (including JZK's fee award) do not evidence an abuse of process. Rather, the Court concludes that such statements reflected at most Coverdale's hope that by putting JZK on notice that any judgment could be discharged in bankruptcy, JZK might forego further litigation. Even Coverdale's alleged consultation with bankruptcy counsel prior to the JZK Lawsuit does not evidence an intent for abuse of process. Coverdale, just as JZK, was entitled to understand the risks of proceeding with the litigation.

Similarly, Coverdale's statements in social media about JZK's legal costs (Ex.'s, P131, P79, P90, P89 and P93, P104) do not establish that Coverdale had a primarily improper ulterior motive. These statements were made to bolster support from other ex-RSE members that were

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20

**Below are the Findings of Fact and Conclusions of Law of the Court.**

following the progress of the case.  Rather than speaking to Coverdale's intent to injure JZK, these statements appear to have been more of a sardonic commentary on the futility of JZK's efforts to seek a monetary judgment against her.

The Court concludes that Coverdale's primary purpose in participating in the litigation was to prevail in her defenses and counterclaims (and avoid liability to JZK), not to force them to spend large amounts in their litigation.  The evidence of improper motives is far more compelling against JZK.

**b.  JZK Failed to Prove that Coverdale's Actions in Her Defense Were Improper**

The Court also concludes that JZK failed to prove that Coverdale's actions in her defense of the JZK Lawsuit improper in the regular prosecution of proceedings.  JZK relies heavily upon *Hough v. Stockbridge*, 152 Wash. App. 328, 216 P.3d 1077 (2009) ("*Hough v. Stockbridge I*"), a case which resulted in a Court of Appeals decision, and then a subsequent nondischargeablility action in a bankruptcy case which was appealed to the District Court for the Western District of Washington. *Hough v. Stockbridge*, 12-cv-5661, 2013 WL 1748450, (W.D. Wash. 2013) ("*Hough v. Stockbridge II*") (collectively, both cases are "*Hough v. Stockbridge*").  The facts of this case are distinguishable from *Hough v. Stockbridge*.

In *Hough v. Stockbridge,* the dispute involved a "Hatfield-and-McCoyesque battle between two neighbors." *Hough v. Stockbridge II*, at *1.  The dispute started after the Houghs obtained a restraining order against their neighbors, the Stockbridges, which resulted in a reciprocal restraining order that applied to both parties. *Id.*  While the restraining order was in place, Mr. Hough filed various complaints with local government agencies, all of which were denied. *Id.*  At the conclusion of the period of the restraining order, the Stockbridges requested a permanent restraining order, which the court denied. *Id.*

Mr. Hough, pro se, then filed a complaint against the Stockbridges for defamation and abuse of process, claiming that the mere request by the Stockbridges for a permanent anti-

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 21

**Below are the Findings of Fact and Conclusions of Law of the Court.**

harassment order had caused "him general and special damages and defamed him." *Id.* In response, the Stockbridges countersued with a claim of "abuse of process." *Id.* The parties arbitrated the matter, and the arbitrator awarded the Stockbridges $25,000 in damages and attorney's fees. *Id.* Undaunted, Mr. Hough demanded a trial by jury, but the judge tried the case without a jury and awarded the Stockbridges $36,000 in damages and $50,000 in attorney's fees. *Id.* Mr. Hough appealed the decision, and the appellate court reversed and remanded the decision after finding a jury necessary. *Id.*

After losing at arbitration and in the bench trial, Mr. Hough filed more than 49 motions, pleadings and discovery documents over 6 years from September 2001 to October 2007, apparently pro se, before ultimately losing at a jury trial. *Id.* The Stockbridges called their former trial attorneys to testify as expert witnesses, and they testified as to Mr. Hough's various violations of procedure. *Hough v. Stockbridge I,* 152 Wash.App. at 335. The Court of Appeals, commenting on the jury's finding, noted:

> Mr. Hough filed at least 49 separate motions and discovery requests in this litigation. Many of Mr. Hough's motions were not filed pursuant to any established court rule or procedure. Each motion, however, required that the Stockbridges respond or appear in court. A jury could, and did, infer from the frequency, number, and nature of Mr. Hough's motions and other process that the documents were not only improper but filed to harass the Stockbridges and increase their cost of litigation.

*Id.* at 346 - 347. A jury held Mr. Hough liable for "abuse of process" and awarded the Stockbridges $200,500 in damages, including $30,467.08 in attorney fees and costs. The facts in *Hough v. Stockbridge* show an extreme form of conduct in litigation which evidences the type of improper behavior required to show an abuse of process.

Coverdale's conduct in the JZK Lawsuit bears little semblance to Mr. Hough's conduct described in *Hough v. Stockbridge*. JZK initiated the JZK Lawsuit, not Coverdale. Unlike Mr. Hough, Coverdale was represented by counsel throughout the state court litigation. The JZK Lawsuit was resolved on summary judgment, rather than requiring three full-blown evidentiary

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22

**Below are the Findings of Fact and Conclusions of Law of the Court.**

hearings, as in *Hough v. Stockbridge*. And Coverdale pursued her right to appeal, and when an adverse ruling came down on appeal, she dropped all efforts to pursue JZK, including dismissing the Coverdale Lawsuit.

Of the 140 exhibits JZK has offered into evidence in this case, only six documents were motions or discovery initiated by Coverdale in the JZK Lawsuit, compared to Mr. Hough's forty-nine documents. The vast majority of the pleadings offered into evidence were JZK's motions or Coverdale's responses thereto. In addition, JZK's Summary of Motion Practice, Ex. P1, which describes pleadings from the JZK Lawsuit not offered into evidence here, shows fewer than ten motions filed by Coverdale in the JZK Lawsuit.

Finally, JZK has not shown that Coverdale's pleadings were "not filed pursuant to any established court rule or procedure" as in *Hough v. Stockbridge*. Except for short periods of time, Coverdale was represented by competent counsel, although they lacked the resources of JZK.

Coverdale's defenses, both the responses to the allegations of JZK, and affirmative defenses, were not improper. JZK suggests that prevailing on a motion to dismiss and on appeal are evidence that the claims were not properly interposed. JZK did not prevail entirely on appeal, as the Court of Appeals specifically concluded that Coverdale's defenses were not frivolous, and remanded one of the contempt rulings. The Court in the Coverdale Lawsuit specifically concluded that the claims brought by Coverdale in that lawsuit were not barred by the ruling of the Court in the JZK lawsuit, citing the edit to the order granting summary judgment from "dismissed with prejudice" to " dismissed as to this case," and the words of the Court in its ruling, "When I am dismissing [the counterclaim] I'm dismissing it in this case. I'm not telling you what you can do or not do in the future."

JZK in its Trial Brief in this case, argues that the Coverdale Lawsuit shows abuses continuing, but in fact the Coverdale Lawsuit was necessitated when they convinced the Court

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23

**Below are the Findings of Fact and Conclusions of Law of the Court.**

in the JZK Lawsuit that the claim was simply a breach of contract suit between the parties, and the other Coverdale claims would need to be pursued separately. The Court in the Coverdale Lawsuit noted that the Court in the JZK Lawsuit had explained that "I don't believe that the defamation is a proper counterclaim to the issue before this Court today. I think I've even mentioned before that some things might be appropriate in another context, but not here." Ex. P115. The Court in the Coverdale Lawsuit denied the JZK motion to dismiss as to most of the claims, and noted of one claim that Coverdale "demonstrated a substantial likelihood that she could prevail." Ex. P115.

More importantly, the fact that JZK prevailed is not evidence that Coverdale's defenses were improperly raised. While JZK ultimately prevailed on most of the issues, there is nothing in the rulings by the Superior Court or the Court of Appeals that suggests that the state courts believed that the claims were frivolous or somehow improperly raised or in bad faith. Notably, in the Coverdale Lawsuit, the trial court allowed Coverdale to proceed with her defamation claims against J.Z. Knight based upon J.Z. Knight's alleged statement calling Coverdale a "whore" in front of a gathering at RSE and allegedly manipulating Coverdale's own brother into writing a letter to the media stating that Coverdale was unfit. Moreover, the Court concludes that the discovery sought by Coverdale fell under the legitimate penumbra of her affirmative defenses and counterclaims.

### c. JZK's Expenses in the JZK Lawsuit Resulted from Its Own Motives, Not Coverdale's Motives

While JZK attempts to portray Coverdale's primary purpose as an attempt to expose and discredit J.Z. Knight and RSE, that is a bit of the pot calling the kettle black. There is more evidence that JZK used the lawsuit and the damages award as an attempt to dissuade Coverdale and other ex-RSE members from speaking out about RSE and J.Z. Knight's statements, teachings and behaviors. J.Z. Knight also used the JZK Lawsuit as a means of seeking revenge on Coverdale for interfering in her relationship with James Flick.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24

**Below are the Findings of Fact and Conclusions of Law of the Court.**

The evidence regarding JZK's efforts to enlist Coverdale's brother in an effort to discredit Coverdale is especially compelling evidence of JZK's motives and strategy. It is demonstrated in the email correspondence at Ex. D3 between Mike Wright, who was a JZK employee in charge of managing its legal work, and Robert Wynne, JZK's then public relations representative. It is also evidenced by JZK providing Champagne's wife, mother and him with free access to an expensive Ramtha "feast." In addition, the Court concludes that the efforts to contact, and in some cases seek discovery from, other members of a group of ex-RSE students sympathetic with Coverdale (the "Enlighten Me Free" group) were not just for information, but were efforts to intimidate those non-parties. JZK had named forty Doe Defendants in their JZK Lawsuit's complaint, with the general allegation that the Doe Defendants were members of the "Enlighten Me Free" group. Ex. P1, pp. 2-5 and P5.

Overall, this Court's conclusion is that JZK was intent on suppressing efforts by Coverdale to expose tenets and practices of RSE because it might cause serious damage to its reputation. JZK attempted to use its superior financial resources to intimidate its dissident ex-students by its lawsuit. Coverdale had the temerity to defend herself in a lawsuit pursued vigorously by J.Z. Knight and JZK. The fact that she did so, and lost, and ultimately gave up the fight, is not an abuse of process.

**Coverdale's Acts Do Not Constitute a Willful Injury**

As the Court concludes that Coverdale did not commit an abuse of process, it also concludes that there was no "willful injury." The Supreme Court in *Kawaauhau v. Geiger (In re Geiger),* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the act itself. *Id.* at 60, 118 S.Ct. 974, *see also In re Ormsby*, 591 F.3d 1199, 1206 (9th Cir. 2010). The Supreme Court held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6)." *Geiger*, 523 U.S. at 61. In *In re Su*, 290 F.3d 1140

(9th Cir. 2002), the Ninth Circuit held that Section 523(a)(6)'s willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his or her own conduct. *Id.* at 1143. The Court concludes that there was no such intent to inflict injury on Coverdale's part.

### Coverdale's Acts Do Not Constitute a Malicious Injury

In *In re Su*, the Court approved of the standard for a "malicious" injury laid out in *Jercich*: (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Id.* (quoting *Jercich*). The Ninth Circuit reaffirmed the holding in *In re Jercich* where the Court treated the 'malicious' injury requirement as separate from the 'willful' requirement, and held that it is reversible error to conflate the "willful" and "malicious" prongs in a court's Section 523(a)(6) analysis. 290 F.3d at 1146-47. Because the bankruptcy court in *In re Su* failed to address this factor, the Ninth Circuit remanded the case "to make appropriate findings on the issue of malice." *Id.* at 1147.

Here, JZK has failed to show a malicious injury. JZK has not shown that Coverdale committed an "abuse of process," so JZK cannot meet the first element of a malicious injury. Moreover, Coverdale had "just cause or excuse" to defend herself in the JZK Lawsuit by raising affirmative defenses and alleging counterclaims. While JZK attempted to portray the JZK Lawsuit as a simple breach of contract matter, the record shows a different story of a former student who was made a pariah for having an affair with J.Z. Knight's boyfriend. When Coverdale formed an organization of former RSE members who were committed to exposing potentially harmful practices of RSE, JZK sought to silence a vocal critic. JZK used the JZK Lawsuit to intimidate other members of Coverdale's support group. Not only did Coverdale's defenses have some merit, she was entitled to defend herself against JZK's allegations and to address JZK's and J.Z. Knight's alleged defamation of Coverdale. That she was unable to convince a state court either through a lack of sufficient evidence or legal argument, does not

**Below are the Findings of Fact and Conclusions of Law of the Court.**

make her defense an abuse of process. The court concludes that Coverdale had just cause or excuse for raising the defenses and counterclaims she raised in the JZK Lawsuit.

### The State Court Contempt Sanctions

JZK contends that two contempt sanctions entered against Coverdale in the JZK Lawsuit in the amounts of $9,017.87 and $3,000 are nondischargeable under §§ 523(a)(6-7).

**1. Section 523(a)(6) Does not Apply to Either of the Contempt Sanctions.**

JZK asserts that Coverdale may be liable for both of the contempt sanctions under 11 U.S.C. 523(a)(6), citing cases that held that a contempt sanction was "willful and malicious" conduct, and suggesting that a per se rule exists. Pl.'s Trial Brief, ECF no. 39, pp. 39-40. The Court is not persuaded by the cases cited, most of which are plainly contrary to Ninth Circuit Bankruptcy Appellate Panel's cases of *Suarez v. Barret (In re Suarez)*, 400 B.R. 732, 737-38 (B.A.P. 9th Cir. 2009) and *Knappenberger v. Knight (In re Knight)*, 10-03092, 2011 WL 6934480 (B.A.P. 9th Cir. 2011) (where Debtor's contempt sanction was held to not constitute willful and malicious injury due to debtor's lack of financial ability to comply with order that resulted in contempt finding). In *Suarez*, the Ninth Circuit Bankruptcy Appellate Panel held that "Section 523(a)(6) does not make contempt sanctions nondischargeable per se. . . . Whether contempt sanctions are nondischargeable accordingly depends not on whether they are labeled as 'contempt,' but on whether the conduct leading to them was 'willful and malicious.'" 400 B.R. at 737.

**a. The $3,000 Contempt Sanction Regarding the October 23, 2013 Order.**

First, the Court considers whether the conduct leading to the $3,000 contempt sanction (that was reversed and remanded) was willful and malicious. The Court of Appeals reversed the Superior Court's finding that Coverdale had violated the writ of execution and remanded the issue to the Superior Court to reconsider the order of contempt and purge condition to determine what part of the sanction, related to the order for which contempt was upheld. Issue preclusion

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 27

**Below are the Findings of Fact and Conclusions of Law of the Court.**

1  does not apply as to the $3,000 contempt sanction because there has not been a final ruling.

2  *Hadley v. Maxwell*, 144 Wash. 2d 306, 27 P.3d 600, 602 (2001).

3  The Court concludes that JZK has not sustained its burden of proof that it suffered a

4  willful and malicious injury as a result of Coverdale's failure to comply with the judge's October

5  23, 2013 Order.[1]

6  The Court concludes that Coverdale did not have the requisite subjective intent required

7  under *In re Su* to injure JZK when she sold her car. It appears the Superior Court's October

8  23, 2013 Order required the parties to obtain separate appraisals of Coverdale's Nissan Xterra,

9  and in the event the appraisers disagreed as to whether the vehicle exceeded Coverdale's

10  $3,250 claim of exemption, they were to appoint a third-party appraiser. It also appears that

11  the October 23, 2013 Order contained no explicit prohibition that prevented Coverdale from

12  disposing of her car. Coverdale stated in her Amended Brief of Appellant that she had obtained

13  an appraisal from Bruce Titus Nissan, but that Bruce Titus Nissan "refused to participate in

14  selecting a tie-breaker appraiser." Ex. P105. The Court concludes that JZK has not shown that

15  Coverdale intended any injury to JZK, when she sold her car for $3,500, believing it to not be

16  in violation of any order and to be a fair price for the vehicle.

17  Third, JZK did not introduce any evidence showing the value of the 2004 Nissan Xterra.

18  While the Court understands generally that the October 23, 2013 Order required the parties to

19  obtain an appraisal, JZK has not established that it would have been entitled to any award on

20  remand, given Coverdale's right to exempt $3250 of the vehicle's value  JZK offered into

21  evidence a Declaration of Virginia Coverdale in which Coverdale stated that the 2004 Nissan

22  Xterra had a trade in value of $2,652.00. Ex. P85 (without the exhibits containing the appraisal).

23  JZK has not met its burden of proof that it suffered a "willful and malicious" injury pursuant to §

24  523(a)(6) as a result of Coverdale's sale of her 2004 Nissan Xterra.

25  _____

[1] JZK did not offer the October 23, 2013 Order into evidence

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28

**Below are the Findings of Fact and Conclusions of Law of the Court.**

**b.  The $9,017 Contempt Sanction Regarding the October 31, 2014 Order.**

JZK contends that the Order dated October 31, 2014 (Ex. P107) which awarded JZK $9,017 in sanctions (the "October 31, 2014 Order") should be given preclusive effect as to whether the breach of the permanent injunction was "willful and malicious."  The order had to do with a Facebook post made by Coverdale, which contained a link to JZK videos different than the one she published on YouTube, which gave rise to the JZK Lawsuit. JZK contended, and the state court held, that the post with the link to the JZK videos violated the permanent injunction entered in the summary judgment in the JZK Lawsuit.

Where the issue preclusion effects of a Washington state court judgment are raised, the Court applies the State of Washington's issue preclusion law.  *Diruzza v. Cty. of Tehama,* 323 F.3d 1147, 1152 (9th Cir. 2003).  Under Washington law, an issue is precluded by a Washington state court judgment where "(1) the issue is identical to an issue resolved in the state court judgment, (2) the state court judgment was a final judgment on the merits, (3) the party against who preclusion is asserted was a party to . . . the prior proceeding and (4) preclusion will not 'work an injustice' on the party against whom it is applied."  *Id.* (citing *Hadley v. Maxwell*, 144 Wash.2d 306, 27 P.3d 600, 602 (2001)).

JZK is not entitled to issue preclusion in this case because the Court failed to find a subjective intent to violate the order as required in *In re Su*.  The Court concludes that the level of intent required for a 523(a)(6) claim is not identical to the issue the Superior Court considered, because the Court only looked at whether Coverdale made the Facebook post, and did not consider whether Coverdale knew that her act was a violation of the permanent injunction.  The Court noted in its ruling on the contempt motion that "whether or not Ms. Coverdale understood is not the issue as far as I'm concerned." Ex. P100, p. 13-14.  The Court did not make the requisite finding under *In re Su*: (1) that Coverdale knew that she was violating the permanent injunction and (2) did so with the intent to injure JZK, or knew that injury to JZK was substantially

certain to follow. *In re Su*, 290 F.3d 1140 (9th Cir. 2002). Thus, the Court declines to grant issue preclusive effect to the October 31, 2014 Order.

In the absence of issue preclusion, JZK's request to have its $9,017.47 in contempt sanctions held non-dischargeable fails as JZK has not met its burden of proof in showing that Coverdale intended to violate the permanent injunction. The Court does not have the Facebook post in question, or any of the comments thereto. JZK has not produced the link to the website that allegedly contained RSE's "information." It has not produced any part of the website or any of the materials which were allegedly RSE's "information." It has not produced any evidence that Coverdale was aware that the website contained any of RSE's "information." The Court concludes that JZK has not met its burden of proof in demonstrating that Coverdale's actions in writing a Facebook post with a link to a website constituted a willful and malicious injury.

### 2. Section 523(a)(7) Does Not Apply to Either of the Contempt Sanctions

The Court concludes that 11 U.S.C. § 523(a)(7) does not apply to the sanctions to make them nondischargeable. That section provides that a discharge under Section 727 does not discharge a debt "(7) to the extent such debt is for a fine, penalty or forfeiture **payable to and for the benefit of a governmental unit**, and is **not compensation for actual pecuniary loss**, other than a tax penalty . . . .." (emphasis supplied). The contempt sanction for $9,017.87 was payable directly to JZK for attorney's fees and costs, so it does not meet the plain language requirements of §523(a)(7). The Court of Appeals reversed and remanded the $3,000 sanction, but the Superior Court did not have a chance to revisit the issue prior to Coverdale's petition date. So the second sanction does not qualify under §523(a)(7) because there is no award of a "fine, penalty or forfeiture" yet.

JZK asserts that it is sufficient for the sanction to be awarded to uphold the dignity of the court, and that the contempt sanction need not be payable "to . . . a governmental unit," relying mainly on *PRP Wine Int'l, Inc. v. Allison (In re Allison),* 176 B.R. 60, 63-64 (Bankr. S.D. Fla.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 30

**Below are the Findings of Fact and Conclusions of Law of the Court.**

1994). In *Allison*, a 1994 decision from the Bankruptcy Court for the Southern District of Florida, the court found that a consent judgment that had been entered into by the debtor prepetition for a violation of an injunction and a judgment based upon the Florida Trade Secrets Act was non-dischargeable under both Section 523(a)(6) and 523(a)(7). *Id.* at 64. The court in *Allison* held that " . . . a fine or penalty need not be *payable to a governmental entity* in order to be for the *benefit* of a governmental agency. . . . it is enough that the fine or penalty, although made payable to a party, be awarded to vindicate the dignity and authority of the court." *Id.*

The problem with JZK's interpretation and the *Allison* decision are that they render a part of § 523(a)(7) meaningless, i.e., the first part of that phrase, "payable to and for the benefit of a governmental entity." (emphasis supplied). The Court believes the better interpretation of §523(a)(7) was set forth in *In re DeMaskey*, No. 04-04123, 2008 WL 2991672, at *6–7 (Bankr. W.D. Wash. Aug. 1, 2008), where the Court followed the Sixth Circuit Court of Appeals in *Hughes v. Sanders (In re Sanders),* 469 F.3d 475 (6th Cir. 2006), *cert. denied,* 549 U.S. 1341, 127 S.Ct. 2051, 167 L.Ed.2d 768 (2007), in holding that in order for §523(a)(7) to apply, the sanction must be actually payable to a governmental unit. The Sixth Circuit in *Sanders* disagreed with and distinguished cases such as *Allison.* It relied on the plain language of the statute to hold that a penalty must be payable to and for the benefit of a governmental unit. *Sanders,* 469 F.3d at 479. In the case of the $9,017.47 contempt sanction, the sanction was payable to JZK, and not to a governmental unit. Moreover, the contempt sanction was compensatory in nature as it awarded JZK the attorney's fees and costs it incurred. Thus, the $9,017.47 contempt sanction does not satisfy either of the requirements of 11 U.S.C. §523(a)(7).

WHEREFORE, a Judgment will be entered in favor of Defendant Virginia Coverdale and against the Plaintiff, JZK, Inc., conforming to the Court's rulings herein.

///END OF ORDER///

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 31